IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JAVIER ALEXANDER BERMUDEZ, and<br>DAVID ROBERT KABLE JR.<br>    *Defendants*. | Case No. 1:25-MJ-509<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF A**
**CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, E. Andrew Ferriter, being duly sworn, depose and state the following:

**INTRODUCTION**

1. This affidavit is submitted in support of a criminal complaint and arrest warrants charging JAVIER ALEXANDER BERMUDEZ (hereinafter "BERMUDEZ") and DAVID ROBERT KABLE JR. (hereinafter "KABLE") with conspiring to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. Specifically, I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2012. As a Special Agent I was initially assigned to the Washington Field Office and

investigated multiple violations to include counterintelligence, violent gangs, narcotics, and domestic terrorism. After nine years as an investigative agent, I was promoted to a Supervisory Special Agent and was assigned as a program manager in the FBI Headquarters' Counterterrorism Division for two years. After my time at FBI Headquarters, I returned to the Washington Field Office, Northern Virginia Resident Agency and was assigned to a squad that investigates darknet related narcotics trafficking and I have been assigned to this squad since December 2023.

3.      Through the FBI, your affiant has received training and experience in interviewing and interrogation techniques; arrest procedures; search and seizure; possession with intent to distribute and distribution of controlled substances; drug and money laundering investigations, including the illegal structuring of financial transactions; surveillance techniques; asset forfeiture; engaging in financial transactions to promote, disguise or conceal illegal drug trafficking and the source of the proceeds derived from it; unlawfully engaging in monetary transactions involving the proceeds of specified unlawful activity, practices commonly referred to collectively as "money laundering"; firearms offenses; and conspiracies associated with the foregoing criminal offenses which are prohibited by Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Sections 922, 1956, and 1957.

4.      In the course of your affiant's training and experience, your affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term undercover operations; consensual monitoring and

recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance, to include Title III wiretaps; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

5. The statements contained in this Affidavit are based on information derived from my personal knowledge, training and experience, information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits, surveillance conducted by law enforcement officers, analysis of documents, public records, controlled purchases of drugs, analyses of telephone records, intercepted communications, and physical evidence obtained during the course of the investigation. Because this affidavit is being submitted for the limited purpose of enabling this Court to support a judicial determination of probable cause for the requested complaint and arrest warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of criminal complaint and arrest warrants.

## FACTS SUPPORTING PROBABLE CAUSE

### I. Law Enforcement's Investigation of the TEGRITYPHARMA Darknet Vendor

6. Since December 2023, The United States, including the FBI, the DEA, the U.S. Postal Inspection Service ("USPIS"), the New York City Police Department (NYPD), U.S. Customs and Border Protection ("CBP"), and Homeland Security Investigations ("HSI") (collectively, the "LAW ENFORCEMENT AGENCIES"), have been conducting a criminal

3

investigation of a darknet market ("DM")[1] drug vendor that operates using the moniker "TEGRITYPHARMA" on various darknet marketplaces.

7. TEGRITYPHARMA's vendor profile on one particular darknet marketplace, Archetyp market,[2] indicated that the vendor profile or account had been active on the Archetyp market since at least September 2023. As of at least May 1, 2025, TEGRITYPHARMA's profile indicated that it had completed at least 1,000 sales of illegal narcotics including Adderall, Xanax, and Oxycodone. TEGRITYPHARMA's profile further reflected at least 350 reviews had been left by customers who purchased narcotics through the TEGRITYPHARMA Archeytp profile. Although TEGRITYPHARMA as of June 2025 listed only pressed Adderall for sale on Archetyp, it previously had several active listings for other substances. In my knowledge, training, and experience, I know that "pressed" pills are not generally obtained from pharmacies but are instead homemade pills that may or may not actually contain the substance they are advertised as containing. The three screenshots below are of TEGRITYPHARMA's vendor page on Archetyp, taken on or about January 8, 2024, showing examples of drugs TEGRITYPHARMA was advertising for sale on Archetyp:

---

[1] A DM is a hidden commercial website that operates on a portion of the Internet that is often referred to as the TOR network, darkweb, or darknet. A DM operates as a black market, selling or brokering transactions involving legal products as well as drugs, weapons, counterfeit currency, stolen credit card details, forged documents, unlicensed pharmaceuticals, steroids, and other illicit goods.

[2] Archetyp Market was dismantled by European law enforcement in June 2025. *See, e.g.*, https://www.europol.europa.eu/media-press/newsroom/news/europe-wide-takedown-hits-longest-standing-dark-web-drug-market.







*January 2024 screenshots of TEGRITYPHARMA's vendor page*

8. Between January 2024 and April 2025, law enforcement conducted multiple controlled purchases of narcotics from TEGRITYPHARMA. These purchases were shipped to locations within the Eastern District of Virginia and elsewhere. Through these purchases from TEGRITYPHARMA, law enforcement received counterfeit pills containing fentanyl, methamphetamine,[3] and N-Pyrrolidino Etonitazene, all controlled substances, among others. The controlled purchases included, but are not limited to, pills bearing the appearance of the following:

   a. Pressed Blue M 30s pills[4]

   b. Pressed Orange Adderall pills

   c. Pressed Green Xanax pills

9. Through controlled purchase and seizures of controlled substances in the course of the investigation, the FBI and law enforcement has purchased and/or seized kilogram quantities of counterfeit Adderall pills, counterfeit Xanax pills, and counterfeit oxycodone pills.

10. Law enforcement identified KABLE, BERMUDEZ, Kenneth LORA, and others both known and unknown, as participants in the conspiracy to distribute controlled substances utilizing the TEGRITYPHARMA vendor accounts on various darknet marketplaces. In

---

[3] Laboratory analysis has confirmed both methamphetamine and methamphetamine (calc. as hydrochloride). For purposes of clarity and continuity, further analyses will be referred to as "methamphetamine."

[4] The most prolific form of fentanyl seen by law enforcement in this region in recent years is in the form of counterfeit pills containing fentanyl. These pills are typically round blue pills imprinted with "M" and "30" and mimic the markings associated with pharmaceutical oxycodone 30mg pills. Common slang terminology used to reference these counterfeit pills containing fentanyl include, but are not limited to: "Blues", "M-30s", "30s", "Percs", and "Perc-30s." "Perc" is a commonly used slang reference that is short for "Percocet" which is a name brand prescription pain killer that contains oxycodone. These counterfeit pills have also been found to at times contain other substances, including Pyrrolidino Etonitazene, heroin, xylazine, and other dangerous substances.

particular, as set forth below, KABLE and BERMUDEZ were identified as co-conspirators involved in the interstate transport and storage of controlled substances as well as pill presses[5] suspected to have been used in the manufacture of counterfeit pills for distribution.

### II. Law Enforcement Identification and Arrest of Kenneth LORA

11. After controlled purchases from TEGRITYPHARMA were identified originating out of the United States Post Office located at 2032 Avenue U, Brooklyn, New York (the "Homecrest Post Office"), on or about June 13, 2024, FBI placed a pole camera at the Homecrest Post Office that began capturing the public area in front of the post office. The United States Postal Inspector Service ("USPIS") also placed a covert camera on the interior of the post office. Using this surveillance, law enforcement observed a male subject, subsequently identified as Kenneth LORA, repeatedly dropping off multiple batches of packages.

12. Through surveillance and other investigative techniques, LORA was ultimately identified as a participant in the conspiracy under investigation involved in the packaging and shipment of controlled substances to those who made purchases via the TEGRITYPHARMA darknet account. Records received via subpoena from a temporary-stay provider revealed that between January 2023 and June 2025, LORA resided at numerous temporary-stay residences in the New York City region, utilizing an account registered in his name. Surveillance of LORA in the course of the investigation revealed LORA moving residences on multiple occasions and traveling frequently from these residences to U.S. Post Offices to deposit packages.

---

[5] Through my law enforcement career, I have become familiar with the ways that drug traffickers utilize pill and tablet press machines to manufacture and produce illicit controlled substances in convenient pill and tablet form. I know, through training and experience, that manufacturing counterfeit pills and tablets can be extremely profitable for drug dealers. It is common for operators of clandestine pill press operations to enlist the assistance of third persons or third-party addresses to purchase and/or receive machines, pill components, binding agents, and related products to avoid law enforcement scrutiny and detection.

13.     LORA was charged via criminal complaint on or about June 2, 2025, in the Eastern District of Virginia, Case No. 1:25-mj-337, with Conspiracy to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. § 846. The charges against LORA in the Eastern District of Virginia remain pending.

14.     On June 4, 2025, LORA was arrested pursuant to an arrest warrant and complaint signed in the Eastern District of Virginia, No. 1:25-mj-337, charging LORA with Conspiracy to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. § 846. During the search of LORA's then-residence in Jamaica Queens, NY pursuant to a search warrant issued in the Eastern District of New York, No. 25-MC-2215, law enforcement seized approximately 34.68 kilograms of counterfeit Adderall pills, 4.92 kilograms of counterfeit Xanax pills, and 1.45 kilograms of counterfeit oxycodone pills. The counterfeit pills were primarily found in black storage bins found in LORA's apartment, as shown in the photographs below. Law enforcement preliminary review of analyses by the Drug Enforcement Agency (DEA) Mid-Atlantic Laboratory (MAL) confirms the presence of at least multiple kilograms of a mixture and substance containing methamphetamine in the seized counterfeit Adderall pills, as well as the presence of N-Pyrrolidino Etonitazene in the counterfeit oxycodone pills seized.

  

*Photographs of Controlled Substances Seized from LORA's Residence on June 4, 2025*

15. LORA's residence further contained paraphernalia that your affiant believes were used to package and ship controlled substances, including USPS envelopes, bubble mailers, mylar bags, a printer, a heat sealer, and numerous postage labels. Postage labels found at LORA's residence included one associated with a controlled purchase made by an undercover law enforcement officer from TEGRITYPHARMA.

### III. Law Enforcement Surveillance of KABLE and BERMUDEZ Delivering Suspected Narcotics

16. As set forth below, during the investigation, law enforcement on several occasions identified KABLE and/or BERMUDEZ moving large black bins of the kind seized from LORA's residence in June 2025 to and from LORA's various residences in New York.

17. For example, on July 11, 2024, LORA and BERMUDEZ were observed moving several bins, what appeared to be USPS packaging material, a large cardboard box, and other miscellaneous items out of a temporary-stay that LORA was then residing at, the "2817 Avenue D Residence".

  

*Screenshots from FBI pole camera footage showing LORA and BERMUDEZ moving items out of the 2817 Avenue D Residence on July 11, 2024*

18.     On August 11, 2024, law enforcement observed LORA, KABLE and BERMUDEZ moving LORA and property out of the basement unit at another temporary stay-residence on 233rd St. in Cambria Heights, New York (located in Jamaica, Queens) (the "Queens Residence"),[6] where LORA was believed to have then been residing. Between approximately 1:00 a.m. and 3:00 a.m., on the street in front of the Queens Residence, LORA and KABLE appeared to move multiple bins and no other items in and out of the house, as depicted below. Your affiant believes this activity occurred at this time of day to avoid detection of the movement of narcotics from LORA's residence. KABLE, LORA, and BERMUDEZ were later identified entering a gray Honda CRV and utilizing it to convey property from the Cambria Heights apartment to a new residence associated with LORA.



19.     Later in the day on August 11, 2024, LORA, KABLE, and BERMUDEZ entered a gray Honda with Massachusetts license plate number 5PAT41. Law enforcement followed the gray Honda to a residence in Fresh Meadows, NY (the "Fresh Meadows Residence"),[7] where they observed LORA, KABLE and BERMUDEZ entering the backyard of the residence through

---

[6] LORA's residing at this residence was further confirmed at the time through surveillance as well as booking and stay records received from his temporary-stay provider.
[7] LORA's approximate month-long stay at the Fresh Meadows residence, which began August 10, 2024, was confirmed via records received from his temporary-stay provider.

a gate and unloading the items removed from the Queens Residence into the basement unit of the Fresh Meadows Residence. Law enforcement believes the move from the Queens Residence to the Fresh Meadows Residence was LORA moving to the Fresh Meadows Residence as his new place of living.

  

*Observation photos and Nest video stills of LORA, KABLE and BERMUDEZ loading items between the gray Honda and the basement unit at the Queens Residence*

20. Law enforcement obtained a Massachusetts driver's license photograph of KABLE and compared that photograph to August 11, 2024, surveillance photographs and confirmed the individual observed on August 11, 2024 to be KABLE. Furthermore, the FBI provided the driver's license photograph of KABLE to law enforcement who conducted surveillance on August 11, 2024, and was advised by those law enforcement officers that KABLE appeared to be the subject they observed on August 11, 2024.

21. Law enforcement further obtained a Massachusetts driver's license photograph of BERMUDEZ and compared the photograph to the individual who was observed with LORA at the 2817 Avenue D Residence on July 11, 2024, and the Queens Residence on August 11, 2024. Based on this comparison, the individual appears to be BERMUDEZ.

11



*Left to right: Massachusetts driver's license photo of BERMUDEZ, observation photographs and Nest still photographs from video of BERMUDEZ at the 2817 Avenue D Residence and the Queens Residence*

### IV. Financial Analysis of Accounts Relating to BERMUDEZ

22. In the course of the investigation, law enforcement received financial records from a variety of sources, including records revealing payments made via Zelle, an application that allows person-to-person money transfers and payments. A review of BERMUDEZ's financial records[8] revealed that from September 2019 through December 2024, BERMUDEZ sent a total of $204,422 in Zelle payments to 23 individuals. These payments included approximately a total of $55,011 to LORA, $6,341 to KABLE, and $4,611 to CC-1. During the same period, BERMUDEZ received approximately $47,461 in Zelle payments from 26 individuals. These payments included approximately a total of $9,141 from KABLE, $8,643 from CC-1, and $808 from LORA

### V. Seized Communications from KABLE's iCloud Showing Suspected Drug Pickup

23. In the course of the investigation, law enforcement obtained a warrant in the U.S. District Court for the District of Columbia for communications and other information associated with the iCloud account dhockeykable781@icloud.com, which law enforcement attributed to

---

[8] Records of Zelle transactions received from Early Warning Services provide these transactions as in the name of BERMUDEZ. Further, the transactions to/from BERMUDEZ were from a Bank of America account subscribed in his name.

12

KABLE via subscriber information provided by Apple confirming the account was registered in KABLE's name. A review of the iCloud data associated with the account identified iMessages believed to be between KABLE and CC-1 that your affiant believes to be associated with the conspiracy under investigation.

24. For example, seized messages show that on or about August 10, 2024, the user of the phone number associated with KABLE's iCloud account[9] coordinated the rental of a Honda CRV the day before the activity described above. Specifically, on August 10, 2024, KABLE contacted another conspirator, CC-1,[10] stating "still need to book it brotha." KABLE added, in part, "we can do the 2019 crv so you can save some money compared to the 2020 pilot." CC-1 responded, agreeing to the CRV and indicating he would send payment to KABLE via Zelle. As described above, on August 11, 2024, law enforcement surveillance captured KABLE, BERMUDEZ, and LORA in a 2019 Honda CRV assisting LORA move residences and moving items from the Queens Residence to the Fresh Meadows Residence.

25. Further review of the iCloud data associated with KABLE identified iMessages between CC-1 and KABLE from months earlier, on or about May 9, 2024, appearing to coordinate the movement of narcotics. In particular, on May 9, 2024, as shown below, the number associated with CC-1 messaged KABLE providing an address in Lynn Massachusetts, stating a person referred to as "[h]e" could meet KABLE now and provided detailed instructions on how to take delivery of "it," which law enforcement believes to be a reference to narcotics, in

---

[9] Hereinafter, messages from KABLE's iCloud account will be referred to as from "KABLE" for clarity.

[10] Among other means, the phone number that KABLE contacted has been associated with CC-1 through Amazon records associating the number with an email address containing CC-1's name, location data confirming the location of the phone at the residence where surveillance has confirmed that CC-1 resides, as well as in the course of KABLE's voluntary interview. Messages from this account will hereinafter be referred to as from "CC-1."

13

exchange for "cheddar." Your affiant understands the reference to "cheddar" to mean that KABLE would receive payment. The conversation between the two included the following:

| Subject Phone | Message Content |
|---|---|
| KABLE | Where at? That should be fine |
| CC-1 | He gonna send addy in the morning he saidso I'll lyk first thing |
| KABLE | Alright cool brother |
| …. | …. |
| KABLE | Yo any word or na? |
| CC-1 | Yeah he said can you go meet him now at [ADDRESS] in Lynn<br>He said just have it in the trunk and pop it and dude will grab<br>When he gets there he gotta back up to the wall it's like those street divider walls<br>That's what he said<br>So your trunk is against wall |
| KABLE | So don't get out of my car? |
| CC-1 | Nope you don't have to brotha<br>Just pop trunk and hell grab it<br>Lmk eta so I can tell dude |
| KABLE | Like 10 min |
| CC-1 | Ok<br>He'll be there<br>Lmk right when you pull up |
| KABLE | Just got here |
| CC-1 | Ok he's coming now<br>… |
| KABLE | Ya the cinderblock dividers |
| CC-1 | Ok<br>He said you can pop now |
| KABLE | It already is<br>I'm waiting for him to come out |
| CC-1 | Ok |
| KABLE | We good |
| CC-1 | Savage I'll link with you later to toss you the cheddar |
| KABLE | Ight I get out around 8 |

## VI.  Seizure of Five Pill Presses at a Storage Unit Registered to BERMUDEZ

26.    On June 9, 2025, pursuant to a subpoena, representatives of U-Haul Moving and Storage of Danvers allowed law enforcement to review current customer lists. Law enforcement searched the name "JAVIER BERMUDEZ" and saw that BERMUDEZ had rented storage unit

14

"1058" in December 2024. Information on the account list the account customer as Javier Bermudez, phone number 781-xxx-3116, email address of javierbermudez75@yahoo.com, and a home address in Lynn, Massachusetts. These identifiers match information known to investigators about BERMUDEZ from the investigation. Moreover, a section in the customer information portal called "Tenant Photos" depicted BERMUDEZ and appeared to have been taken by BERMUDEZ himself.

27. A U-Haul representative advised that no one had entered storage unit 1058 since December 2024, the same month that BERMUDEZ had the unit. The representative advised that U-Haul uses electronic sensors to monitor access to its storage units and there was no record of access since December 2024. In addition, access to the unit requires entry of a code prior to unlocking the storage unit. If the access code is not entered, an alarm is triggered. U-Haul confirmed that the last known access to the unit was in December of 2024.

28. On June 17, 2025, members of law enforcement executed a search warrant issued by Chief Magistrate Judge Cabell out of the District of Massachusetts, 25-1125-DLC, on a U-Haul storage unit located in Danvers, MA.

29. During execution of the search warrant, members of law enforcement seized five pill presses, drug manufacturing equipment and suspected illegal narcotics. Analysis of the suspected narcotics remains pending. Pictures of the seizure[11] are listed below for reference.

---

[11] The third photograph, as depicted from left-to-right, depicts multiple pill presses that had been seized from Unit 1058 after they had been moved to a second location by law enforcement. It does not depict the presses in storage unit 1058.

15

  

*June 17, 2025, Storage Unit Search*

### VII. Voluntary Interview of KABLE

30.     On or about July 30, 2025, agents conducted a voluntary interview of KABLE in Massachusetts. During the interview, among other things, KABLE advised he was transporting what he believed to be Adderall to LORA beginning in or around the end of 2023. KABLE advised he knew he and BERMUDEZ were transporting illegal narcotics to LORA, and that LORA would ship out the drugs via the United States Postal Service (USPS). KABLE advised that CC-1 provided instructions to KABLE, BERMUDEZ, and LORA. KABLE advised that CC-1 had once told KABLE he was operating via a darkweb vendor account. During the interview, KABLE believed the vendor name was "TegrityFarms." KABLE picked up the drugs in Lynn, Massachusetts. KABLE specified having received drugs in Lynn via opening the trunk of his vehicle and that the individuals depositing the drugs always wore a face mask.

31.     KABLE believed he had transported bins with illegal narcotics to LORA on approximately 3-4 occasions, with the most he ever transported at once was four to five bins, and the least amount he transported was one bin. KABLE estimated that CC-1 paid him approximately $3,300 to $3,500 for the transportation of illegal narcotics to LORA.

16

32. KABLE specified that on his first trip to LORA's residence, LORA opened a bin in KABLE's presence, and KABLE observed circular orange in color pressed pills. On the second trip to visit LORA, KABLE observed oval shaped pills in a different shade of orange, possibly pink in color.

33. With respect to BERMUDEZ, KABLE stated that BERMUDEZ accompanied KABLE on two trips to visit LORA, the first trip was to help LORA move and they brought bins with them on that occasion, and the second trip with KABLE and BERMUDEZ they did not bring any bins. KABLE advised that if he wasn't available to transport bins to LORA, that CC-1 would ask BERMUDEZ to do so. KABLE believed BERMUDEZ transported bins to LORA approximately three times without KABLE.

34. KABLE further provided that on one occasion in either late 2024 or early 2025, KABLE, BERMUDEZ, and others met at a residence in Lynn, Massachusetts in an attempt to move pill presses at the direction of CC-1. KABLE stated they were able to move some pill presses at the residence and loaded them onto a U-Haul, but that one was too heavy to move.

## CONCLUSION

35.  Based on the facts set forth above, I respectfully submit that there is probable cause to believe that between at least as early as September 2023 and continuing to at least June 2025, within the Eastern District of Virginia and elsewhere, JAVIER ALEXANDER BERMUDEZ and DAVID ROBERT KABLE JR. did knowingly and intentionally conspire with others, known and unknown, to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846.

Respectfully submitted,

*E. Andrew Ferriter*
E. Andrew Ferriter
Special Agent
Federal Bureau of Investigation

Sworn to before me in accordance with Fed. R. Crim. P. 4.1 by telephone this 22nd day of August 2025:

Digitally signed by Ivan Davis
Date: 2025.08.22 09:54:12 -04'00'

Honorable Ivan D. Davis
United States Magistrate Judge

18